# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

FRANCISCO CARRANZA, ORQUIDEA ELIZABETH JUÁREZ RIVERA, ORQUIDEA DAYRINA RIVERA PEÑA, and JENNYFER DAYRINA JUÁREZ RIVERA,

        Plaintiffs,

v.

SAM GALLUZZI,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:23-cv-00758
Judge Aleta A. Trauger

## MEMORANDUM

In their First Amended Complaint ("FAC") (Doc. No. 26), plaintiffs Francisco Carranza, Orquidea Dayrina Rivera Peña, Orquidea Elizabeth Juárez Rivera, and Jennyfer Dayrina Juárez Rivera[1] assert claims under 42 U.S.C. § 1983 against defendant Sam Galluzzi for (1) the unlawful search and seizure of Orquidea Elizabeth Juárez Rivera; (2) the unlawful seizure of the other three plaintiffs; and (3) the unlawful search of their residence. Now before the court is Galluzzi's Motion to Dismiss all claims against him in the FAC. (Doc. No. 30.) For the reasons set forth herein, the motion will be denied.

## I.    ALLEGED FACTS AND PROCEDURAL HISTORY

The plaintiffs filed their original Complaint in July 2023. (Doc. No. 1.) After Galluzzi moved to dismiss, they filed the FAC (Doc. No. 26) to clarify and provide further support for their claims.

---

[1] Carranza and Peña are married. (FAC ¶ 61.) Orquidea Rivera and Jennyfer Rivera are their daughters. (*Id.* ¶ 62.)

As set forth in the FAC, the plaintiffs are all longtime residents of Davidson County, and they reside at 2248 Preserve Circle, Antioch, Tennessee. (FAC ¶¶ 4–7, 9.) Galluzzi is a Special Agent for the Tennessee Bureau of Investigation ("TBI"). (*Id.* ¶ 8.)

Beginning in or around February 2022, the Middle Tennessee Drug Related Death Task Force ("DTF"), comprised of law enforcement officers from multiple agencies, launched an investigation ("Investigation") into a "source" bringing drugs into the Middle Tennessee region and his "distribution organization." (*See* TBI Investigative Report ("TBI File"), Doc. No. 27, at 2, 3; FAC ¶ 10.) The DTF suspected this "source," an individual identified in the FAC as "Suspect-1," as the person responsible for coordinating narcotics distribution across several states. (FAC ¶ 11.) The DTF identified several other suspected members of the distribution organization. (*Id.* ¶ 10.)

On November 15, 2022, after months of investigation, Galluzzi obtained a Search Warrant for the plaintiffs' residence at 2248 Preserve Circle. (Doc. No. 27, at 65–66.) To obtain the Search Warrant, Galluzzi presented a sworn Affidavit in Support of Search Warrant to Judge Dozier of the Davidson County Criminal Court ("Affidavit"). (Doc. No. 27, at 57–64.) In the Statement of Facts in Support of Probable Cause set forth in the Affidavit, which contains the only facts that specifically justify a warrant to search 2248 Preserve Circle, Galluzzi made the following allegations:

> 7.      On September 20, investigators conducted an oral interview with a known member of this [drug trafficking organization ("DTO")], [who] cooperated with investigators of his own accord and detailed information about the leader of the [DTO], who is known as Francisco aka "Pancho," "El Jefe."[2] [The Confidential Informant ("CI")] stated to investigators that Pancho is responsible for coordinating large amounts of narcotics to be distributed across multiple states in the southeast region of the United States of America. [The CI] stated that Pancho lives in Tennessee with his wife off exit 62 on Interstate 24. [The CI] also mentioned

---

[2] Pancho appears to be the individual identified in the FAC as "Suspect-1."

Pancho is known to drive a newer model Ford F-150.

8.      On October 13, 2022, investigators conducted an oral interview with an additional cooperating defendant (CD-2), who initiated a conversation with investigators in the inner workings of this DTO. During the interview, CD-2 stated to investigators the DTO leader is a male Hispanic that goes by "El Jefe." CD-2 identified what they believed to be a stash house for narcotics at 2248 Preserve Circle, Antioch, TN 37013. CD-2 also pointed out to investigators a known vehicle Pancho utilizes, a newer model Ford F-150, in the driveway of 2248 Preserve Circle.

9.      On October 18, 2022, investigators conducted surveillance on the residence, 2248 Preserve Cir, Antioch, TN. During surveillance, investigators observed a newer model Ford F-150 in the driveway bearing TN Temp Tag QYBNC2E, a silver Chrysler 300 bearing a TN Temp Tag QFH6ATJ, and a beige Chevrolet Malibu bearing TN tag BJH8884.

10.     On October 20, 2022, investigators conducted surveillance on Pancho in his Ford F-150 bearing a TN Temp Tag QYBNC2E. Investigators followed Pancho, in the Ford F-150, from the carwash, located at [an address on] Murfreesboro Pike, Nashville, TN, to one of his residences being 2248 Preserve Circle, Antioch, TN.

11.     Through communications intercepted on TARGET TELEPHONE 3, investigators learned of an individual, who goes by "Luis" or "Coco," to be a main courier of narcotics for Pancho. During the course of conducting multiple surveillance operations, investigators have observed LUIS utilizing a silver Chrysler 300, bearing a TN Temp Tag QFH6ATJ. This same vehicle has been observed via multiple physical/electronic surveillance operations parked in both the driveway and on the street next to 2248 Preserve Circle.

12.     During the search of a law enforcement database, investigators conducted a query of 2248 Preserve Circle, Antioch, TN. Upon reviewing the results, investigators found a Francisco Carranza to be a resident since 7/31/2022 and a close relative/associate to be an individual by the name of "Luis."

13.     Investigators conducted a query of Nashville Electric Service on 2248 Preserve Circle, Antioch, TN. Results showed the listed account owner to be a Francisco Carranza-Giles and Orquidia [sic] Rivera-Pena.

(Doc. No. 27, at 60–61.) The Search Warrant for 2248 Preserve Circle was issued based on these allegations.

On the same day, Galluzzi also obtained Search Warrants for *2268* Preserve Circle and 1717 Hobson Pike, Apt. 1204, also in Antioch, Tennessee, while another officer involved in the

Investigation obtained a Search Warrant for 3719 Woodbury Pike, Murfreesboro, in Rutherford County, Tennessee. (*Id.* at 78–79, 54–54, 82–83.)

Based on the investigative records contained in the TBI File that the plaintiffs filed with the FAC, the plaintiffs allege that all of the allegations in the Affidavit referring to *2248* Preserve Circle are false. In particular:

(1) While paragraph 8 states that CD-2 told investigators during an interview on October 13, 2022 that Suspect-1 has a stash house located at 2248 Preserve Circle, nothing in the TBI File supports that statement. To the contrary, the Affidavit in Support of Search Warrant for 1717 Hobson Pike, Apartment 1204, in Antioch, Tennessee refers to the same October 13, 2022 oral interview with CD-2, and states that CD-2 relayed to officers that that another member of the DTO maintained a residence at 1717 Hobson Pike. (Doc. No. 27, at 48.) Another cooperating witness interview on October 25, 2022 referenced the witness's residence at "120-B Robert Yost Drive" (*id.* at 4), and a different investigative report reflects that officers were conducting surveillance at "a possible stash house" at "120-B Robert Yoest Dr." in Antioch (*id.* at 29.)

(2) Paragraph 9 states that officers conducted surveillance on *2248* Preserve Circle in Antioch on October 18, 2022 and observed various vehicles in the driveway. (Doc. No. 27, at 60.) Again, however, the TBI File contains no reference to *2248* Preserve Circle or to any surveillance conducted on that residence. However, the Affidavit in Support of Search Warrant for *2268* Preserve Circle references "multiple surveillance operations at *2268* Preserve Circle," observations of the same vehicles, in particular Pancho's Ford F-150, "parked in the driveway of *2268* Preserve Circle," and an intercepted telephone call on October 18, 2022 in which Pancho gave *2268* Preserve Circle as his address for purposes of picking up or dropping off funds and narcotics. (Doc. No. 27, at 73.)

(3) Paragraph 10 states that, on October 20, 2022, Pancho was surveilled in his Ford F-150 from the carwash on Murfreesboro Pike to "one of his residences being *2248* Preserve Circle, Antioch, TN" (Doc. No. 27, at 60), but the investigative report for that incident in the TBI File states that, on that day, investigators "successfully surveil[led] Pancho from the car wash to his suspected residence located at *2268* Preserve Circle, Antioch, TN 37013." (*Id.* at 29.)

(4) The Affidavit identifies one of Pancho's "main couriers" as an individual who "goes by" "Luis" or "Coco" and uses a silver Chrysler 300, bearing TN Temp Tag QFH6ATJ, that had been "observed via multiple physical/electronic surveillance operations parked in both the driveway and on the street next to 2248 Preserve Circle, Antioch, TN." (Doc. No. 27, at 60.) The surveillance reports in the TBI File, however, contain multiple references to the Chrysler 300, but none indicates that it was surveilled at *2248* Preserve Circle. (*See, e.g.*, Doc. No. 27, at 22 (TBI Investigative Report of September 20, 2022 interview of CI, who stated that Pancho has a brother named "Zaid," who drives both a gray Dodge Challenger and a gray Chrysler 300); *id.* at 23 (November 5, 2022 surveillance report of tracking device on "Luis' silver Chrysler 300," documenting its movement from Luis's known residence in Murfreesboro to another suspect's known residence at 1717 Hobson Pike, in Antioch); *id.* at 29 (detailing surveillance observations on October 20, 2022 of Pancho getting into "dark colored Chrysler 300" at 385 David's Way, LaVergne, Tennessee, and later seeing that same vehicle travel to a different address in LaVergne and then back to the Murfreesboro license listed on the vehicle registration).)

Again, the TBI File filed with the FAC does not reflect any evidence that Pancho or any other member of the DTO resided at 2248 Preserve Circle, kept drugs at 2248 Preserve Circle, or ever visited or interacted with any of the residents of 2248 Preserve Circle. (*Id.* ¶ 14.) The TBI File summarizing various investigative efforts and interviews does not contain any reference to

2248 Preserve Circle, to the residents of 2248 Preserve Circle, or to the phone numbers of any of the residents. (Doc. No. 27, *passim*.) According to the plaintiffs, the Investigation found no evidence that any resident of 2248 Preserve Circle was involved, or suspected of involvement, in the narcotic distribution organization that was the subject of the Investigation. (FAC ¶ 15.)

Nonetheless, the FAC alleges that Galluzzi identified each of the plaintiffs to "other law enforcement officers and agencies as targets for searches and seizures" and personally "organized and directed a multi-agency law enforcement operation for the purpose of searching and seizing the Plaintiffs and their property on November 16, 2022," the day after the Search Warrants issued. (FAC ¶¶ 33, 34.) More specifically, on the afternoon of November 16, 2022, Orquidea Elizabeth Juárez Rivera ("Rivera") was pulled over by police officers while driving from a shopping mall to her place of work in Davidson County in her 2008 Toyota Corolla, even though she was not speeding and did not commit any other traffic violations. (*Id.* ¶¶ 35–36.) The plaintiffs allege that Rivera was pulled over because Galluzzi had identified her as a participant in criminal activity and directed officers to seize her and/or her vehicle, despite his having no knowledge of any facts or circumstances that provided a reasonable basis for believing that she was involved in criminal activity. (*Id.* ¶¶ 37–38.)

At the time Rivera was pulled over, officers did not have a warrant to search or seize her or her vehicle, and they did not have a reasonable suspicion of criminal activity to justify the initial stop, nor did they have probable cause to conduct a search or seizure. (*Id.* ¶¶ 41–43.) She was nonetheless ordered out of her vehicle and placed under arrest, while the officers proceeded to conduct a K-9 search of her vehicle. Although this process, which took approximately 40 minutes, yielded no evidence of drugs or other illegal activity, officers did not release Rivera but instead drove her, still handcuffed and detained in the back of a police cruiser, to her residence at 2248

Preserve Circle. (*Id.* ¶¶ 45–50.)

Officers left Rivera in the police cruiser while they proceeded to execute the Search Warrant at 2248 Preserve Circle. Rivera observed while law enforcement officers deployed an explosive device to breach the doorway and enter the residence. (*Id.* ¶¶ 51–52.) Around this time, plaintiff Francisco Carranza arrived home to see approximately fifty law enforcement officers and fifteen law enforcement vehicles in the street leading to his home. When he left his vehicle to ask a police officer what was happening, the officer drew his firearm, pointed it at Carranza, and ordered him to get on the ground and then eventually to get back in his vehicle and not leave. (*Id.* ¶¶ 53–57.) Police officers asked him if he knew "Francisco Rivera" or "Francisco Luis," and he told them he did not. (*Id.* ¶ 58.) Carranza remained in his vehicle under the impression that he was not permitted to leave while law enforcement officers searched his residence. (*Id.* ¶ 60.)

Carranza called his wife, plaintiff Peña, who was shopping with the couple's other daughter, plaintiff Jennyfer Rivera. (*Id.* ¶¶ 61–62.) When Peña and Jennyfer Rivera arrived home around 5:00, they were immediately approached by law enforcement officers and told not to leave the vehicle. (*Id.* ¶¶ 64–65.) They stayed in their vehicle, under the impression that they could not leave. (*Id.* ¶ 67.)

Around 7:00 p.m., law enforcement officers realized that "information provided in the search warrant was incorrect and the wrong residence was being searched." (*Id.* ¶ 68.) At this time, an officer approached Carranza, apologized, gave him a copy of the Search Warrant, and took a picture of him with the Search Warrant. They also released Rivera and apologized to her as well. (*Id.* ¶¶ 69, 71.) Even after this, the plaintiffs were not allowed to reenter their house for another two hours. (*Id.* ¶¶ 73, 75.) Upon being allowed back into their home, the plaintiffs discovered extensive damage, including that the front door was blasted off with explosives, which also

damaged flooring and carpeting; the living room was "torn to pieces"; the pull-down attic staircase was broken; the backdoor had been forcibly removed; and their personal items were in complete disarray. (*Id.* ¶¶ 79–85.)

The plaintiffs allege that defendant Galluzzi "directed the actions of law enforcement officers who participated in the searches and seizures of the Plaintiffs and their home on November 16, 2022," "directly participated in the raid of the Plaintiffs' residence," and "authorized, encouraged, and approved of the searches and seizures" of the plaintiffs and their property and the manner in which the searches and seizures were performed. (FAC ¶¶ 77–78, 86–87.)

Further, based on a comparison between the "facts" linking the drug conspiracy to 2248 Preserve Circle set forth in Galluzzi's Affidavit and the conflicting evidence referenced in the TBI File, and the absolute dearth of any evidence in that File linking 2248 Preserve Circle to the drug operation under investigation, the plaintiffs assert that Galluzzi "intentionally or recklessly" made numerous false statements in the Affidavit, including that Pancho was trailed to 2248 Preserve Circle, that his vehicle or those of his known associates were parked in front of the residence or in the driveway of 2248 Preserve Circle, and that 2248 Preserve Circle was identified by a witness as a stash house. (FAC ¶¶ 19–22.) The plaintiffs themselves, at the time of the Investigation, drove a 2008 Toyota Corolla, a 2023 Chevrolet Tahoe, and a 2022 Chevrolet Silverado (*id.* ¶ 23), none of which was identified in the TBI Investigative File as associated with any participant in the drug trafficking organization that was the target of the Investigation.

The plaintiffs also allege that Galluzzi recklessly failed to perform any due diligence to confirm or verify whether plaintiff Francisco Carranza was associated with any of the suspects being tracked during the investigation, or as to whether his phone number, or any other plaintiff's phone number, had ever been dialed by Pancho or any other suspect during the targeted intercepted

communications between February 2022 and November 2022. (*Id.* ¶¶ 26–26.) They deny any involvement in drug trafficking and deny that any evidence exists to link them or their residence at 2248 Preserve Circle to the drug trafficking organization being investigated by Galluzzi and the DTF. They assert that, without the false statements in the Affidavit, there would have been no probable cause to secure the November 15, 2022 Search Warrant, no basis for stopping and detaining Rivera, and no basis for detaining any of the other plaintiffs during the search of their residence.

The FAC states a "First Claim for Relief" against Galluzzi under 42 U.S.C. § 1983 for violation of Rivera's rights under the Fourth Amendment, based on the unlawful search and seizure by police officers who "seized Ms. Rivera and her vehicle . . . at the direction of Defendant Galluzzi," who "knew or reasonably should have known that his actions in directing Ms. Rivera's seizure were unsupported by probable cause." (FAC ¶¶ 93, 94.) They assert that Galluzzi identified Rivera and/or her vehicle as involved in illegal narcotics trafficking and as targets for arrest and seizure, despite a complete lack of evidence to support either reasonable suspicion or probable cause to believe Rivera was involved in the drug trafficking operation. (*Id.* ¶¶ 103–04.) But for his intentionally and/or recklessly made false statements, there would have been no probable cause to secure a search warrant or to conduct the search and seizure of Rivera and her vehicle. (*Id.* ¶ 106.)

The Second Claim for Relief against Galluzzi under § 1983 asserts that he violated the other three plaintiffs' Fourth Amendment rights by directing their detention during the search of their residence, that they would not have been detained but for the false statements made in Galluzzi's Affidavit and his falsely identifying them and their residence as involved in drug trafficking; and that he was in possession of no evidence providing reasonable suspicion or probable cause to believe that they were involved in drug trafficking. (*Id.* ¶¶ 111-23.)

For their Third Claim for Relief, the plaintiffs assert that Galluzzi violated their Fourth Amendment rights to be free from unreasonable searches by procuring a search warrant based on knowing or reckless falsehoods and that, without the untrue statements in the Affidavit, probable cause did not exist, no judge would have issued a search warrant for their residence, and they would not have been forced to suffer the unlawful search of their residence. (*Id.* ¶¶ 125–35.)

Galluzzi has now filed his Motion to Dismiss the FAC, along with a supporting Memorandum of Law. The court understands him to be arguing that (1) he is entitled to qualified immunity in connection with the search of the residence at 2248 Preserve Circle, because (a) the plaintiffs have no evidence that he stated a deliberate falsehood or showed reckless disregard for the truth in his Affidavit and (b) they cannot show that the allegedly false or omitted information was material to the finding of probable cause; (2) the claims on behalf of Carranza, Peña, and Jennyfer Rivera should be dismissed, because these three plaintiffs were lawfully detained during the execution of a valid search warrant; and (3) all of the plaintiffs' claims should be dismissed because there are no allegations that Galluzzi participated directly in any allegedly unconstitutional conduct. (Doc. No. 31.) The plaintiffs oppose the motion (Doc. No. 36), and Galluzzi filed a Reply (Doc. No. 37).

## II.   STANDARD OF REVIEW

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556. According to the Supreme Court, "plausibility" occupies that wide space between "possibility" and "probability." *Iqbal*, 556 U.S. at 678. If a reasonable court can draw the necessary inference from the factual material stated in the complaint, the plausibility standard has been satisfied.

Generally, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). At the same time, however, it has long been the rule that a court may consider not only the complaint, but also any exhibits attached to it and exhibits attached to a defendant's motion to dismiss, "so long as they are referred to in the Complaint and are central to the claims contained therein." *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 694 (6th Cir. 2018) (citation omitted).

III. **ANALYSIS**

A. **Qualified Immunity**

Under 42 U.S.C. § 1983, a plaintiff may bring suit against any person who, acting under

color of law, violated his or her constitutional rights. While the statute is straightforward enough, the doctrine of qualified immunity places significant limits on the ability of those individuals whose rights may have been violated to actually vindicate those violations.

To survive a motion to dismiss on qualified-immunity grounds, a complaint must allege facts that "plausibly mak[e] out a claim that the defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable officer would have known that his conduct violated that right." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015). The Complaint must allege with particularity "facts that demonstrate what [a] defendant did to violate the asserted constitutional right." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016) (quoting *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011)). The plaintiff bears the ultimate burden of showing that a defendant is not entitled to qualified immunity. *Id.* However, while qualified immunity questions should be answered at the earliest possible stage of litigation, the Sixth Circuit has cautioned that "it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity." *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015).

"Qualified immunity involves a two-step inquiry. First, viewing the facts in the light most favorable to the plaintiff, the court must determine whether the officer committed a constitutional violation." *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (citing *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002)). If so, the court must also "determine whether that constitutional right was clearly established at the time of the incident." *Id.* The court may address these questions in any order, but the answer to both must be yes. *Id.* at 648.

Under the second element, qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Consequently, a government official "will not be liable for mere mistakes in judgment, whether the mistake is one of fact or one of law." *Hicks v. Scott*, 958 F.3d 421, 433 (6th Cir. 2020) (quoting *Butz v. Economou*, 438 U.S. 478, 507 (1978)). Thus, for example, "[a]n officer conducting a search is entitled to qualified immunity if 'a reasonable officer could have believed' that the search was lawful 'in light of clearly established law and the information the searching officer[] possessed.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 566 (2004) (Kennedy, J., dissenting)). This is an objective standard. *See Ziglar v. Abbasi*, 582 U.S. 120, 151, (2017) ("Whether qualified immunity can be invoked turns on the objective legal reasonableness of the official's acts. And reasonableness of official action, in turn, must be assessed in light of the legal rules that were clearly established at the time [the action] was taken. This requirement—that an official loses qualified immunity only for violating clearly established law—protects officials accused of violating extremely abstract rights." (internal quotation marks and citations omitted)). In sum, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.*

> **B.  Third Claim for Relief – the Search Warrant Affidavit**

The plaintiffs assert that the search of their home was in violation of their Fourth Amendment rights. Galluzzi claims entitlement to qualified immunity.

Under the Fourth Amendment, a search warrant may be issued only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the . . . things to be seized." U.S. Const. amend. IV. "Probable cause exists if the facts and circumstances are such that a reasonably prudent person would be warranted in believing that an offense had been committed and that evidence thereof would be found on the premises to be searched." *Tlapanco*, 969 F.3d at 648 (quoting *Peffer v. Stephens*, 880 F.3d 256, 263 (6th Cir. 2018)) (internal quotation

marks omitted)). To assess probable cause, "the officer must examine 'the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence.'" *Id.* (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000)).

In the Fourth Amendment search and seizure context, "[p]olice officers are entitled to rely on a judicially secured warrant for immunity from a § 1983 action for illegal search and seizure unless the warrant is so lacking in indicia of probable cause, that official belief in the existence of probable cause is unreasonable." *Yancey v. Carroll Cty.*, 876 F.2d 1238, 1243 (6th Cir. 1989). However, "an officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant." *Id.*

And, at the time the search warrant was issued in this case, "the right to be free from searches and seizures predicated on an officer's reckless submission of false statements in a warrant affidavit [was] clearly established." *Tlapanco*, 969 F.3d at 649.

Because that right is well established, a plaintiff who claims violation of that right responding to an officer's assertion of qualified immunity may avoid dismissal of his claims by showing that "(1) the officer's warrant affidavit contained a false statement or omission that was made either deliberately or with reckless disregard for the truth; and (2) the false statement or omission was material to the finding of probable cause." *Id.* (citing *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003); *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010)). "Once a plaintiff makes the first showing, the Fourth Amendment requires the court to 'set aside the [false] statements and include the information omitted in order to determine whether the affidavit is still sufficient to establish probable cause.'" *Id.* (quoting *Sykes*, 625 F.3d at 305). "A plaintiff shows substantial evidence of deliberate falsehood or reckless disregard when, for example, he presents

proof that at the time the officer swore out the affidavit, she knew of or possessed information that contradicted the sworn assertions." *Id.* (quoting *Butler v. City of Detroit*, 936 F.3d 410, 419 (6th Cir. 2019)).

In the present case, according to the plaintiffs, the following statements in the Affidavit were false:

> (1) on October 20, 2022 investigators conducted surveillance and followed the drug trafficking leader to "one of his residences being 2248 Preserve Circle, Antioch, TN";

> (2) a suspect named "Luis" who drives a silver Chrysler 300 was seen parked in the driveway of 2248 Preserve Circle;

> (3) a black Ford F-150 belonging to the drug trafficking leader was seen parked in the driveway of 2248 Preserve Circle, Antioch, TN; and

> (4) a Chevrolet Malibu belonging to a suspect of the drug trafficking organization was seen parked in the driveway of 2248 Preserve Circle.

(Doc. No. 36, at 4 (citing FAC ¶ 18(a)–(3) and Doc. No. 27, at 60–61).)

Galluzzi's position is, first, that his Affidavit does not contain materially false statements. Second, he asserts that, even if it does, if the purportedly false statements are removed, probable cause for the search still exists. Notably, he does not claim that the address on the Affidavit or Search Warrant (*2248* Preserve Circle) was simply a typographical error that was repeated by negligence or the type of oversight to which qualified immunity might attach. Instead, he presses forward with the assertion that he intentionally obtained a warrant for that address (as well as for *2268* Preserve Circle) based on the existence of probable cause.

Thus, for example, regarding the statement in his Affidavit that investigators observed Pancho drive from a carwash on Murfreesboro Road to *2248* Preserve Circle, Galluzzi does not actually concede that this statement was false, even though the investigative report documenting that event states that Pancho drove to *2268* Preserve Circle. Instead, Galluzzi posits that "[i]t is not

known whether the investigative report or the search warrant listed the incorrect address." (Doc. No. 30, at 6.) This assertion is effectively refuted, at least on the record before the court, by the fact that the TBI File produced as an exhibit to the FAC contains no references to *2248* Preserve Circle outside the Affidavit and the Search Warrant for the residence at that address. Moreover, the defendant is also now in the position to know for sure whether the search of *2268* Preserve Circle yielded evidence relevant to the Investigation—and that the search of *2248* Preserve Circle did not—such that his claim now to not know which of the two documents was incorrect seems disingenuous at best. More importantly, the statement in the Affidavit is expressly contradicted by information in the TBI File, which states that Pancho was tailed driving from the carwash on the particular date to *2268* Preserve Circle.

Galluzzi next claims that the reference to tailing Pancho from the carwash to *2248* Preserve Circle "was only one of several pieces of information establishing probable cause." (Doc. No. 31, at 6.) According to the defendant, "[t]he search warrant also relied on several other sightings of known DTO vehicles in front of 2248 Preserve Circle, in addition to [CD-2's] statement identifying it as a stash house," and these other allegations were sufficient to establish probable cause. (*Id.*) More specifically, with respect to the plaintiffs' claim that the Affidavit falsely stated that Pancho's Ford F-150 and various vehicles known to be used by his associates were seen parked in the driveway or in front of *2248* Preserve Circle, the defendant responds that, "in fact, the TBI File states that vehicles known to be associated with DTO members were parked at both 2248 and 2268 Preserve Circle." (*Id.* at 6 (citing TBI File, Doc. No. 27, at 60, 72–74).) As set forth above, however, this assertion is directly contradicted by the TBI File, in which the *only* reference to *2248* Preserve Circle is within the Affidavit in support of the Search Warrant for 2248 Preserve Circle and the Search Warrant itself. (Doc. No. 27, at 57–66.) In other words, the defendant cites the

Affidavit and Search Warrant as evidence in support of the Affidavit and Search Warrant. The investigative record itself—at least the record before the court—contains no independent supporting evidence, and the statements in the Affidavit are refuted by contrary facts in the investigative record.

Similarly, Galluzzi asserts that the "search warrants list different occasions when DTO vehicles were spotted at each location," pointing out that Galluzzi obtained search warrants for both 2248 and 2268 Preserve Circle, as well as for two other addresses, on the same date. (*Id.* (citing TBI File, Doc. No. 27, at 43–93).) But again, as indicated above, the Affidavit misstates the evidence in the investigative record, and the only time *2248* Preserve Circle shows up in the record before the court is in Galluzzi's Affidavit and the Search Warrant for that address.

Regarding the plaintiffs' assertion that he falsely stated that a CI identified 2248 Preserve Circle as a stash house, Galluzzi claims that there are "no factual allegations to support the conclusion that this was a false statement." (Doc. No. 31, at 6–7.) While it is true that the TBI File does not reflect that any CI made the statement, "2248 Preserve Circle is *not* a stash house," it also does not contain any assertion by a CI that it *was* a stash house. In addition, the TBI File affirmatively shows that *2268* Preserve Circle was identified as one of Pancho's residences and that other addresses (for which other search warrants were issued) were identified as possible stash houses. The investigative records in the TBI File support the plaintiffs' allegation that the Affidavit falsely stated that 2248 Preserve Circle had been identified as a stash house.

As for the false statements that the plaintiffs were engaged, or suspected of engaging, in money laundering and drug trafficking, Galluzzi maintains that the Affidavit does not accuse the residents of crimes but merely posits "reasons why there is probable cause to believe that the residence contains evidence of these crimes." (*Id.* at 7.) And, while he is correct that "search

warrants are directed, not at persons, but at property where there is probable cause to believe that instrumentalities or evidence of crime will be found," *Mays v. City of Dayton*, 134 F.3d 809, 814 (6th Cir. 1998), the plaintiffs are also correct that the TBI File as a whole contains no evidence implicating them. Thus, the assertion to the contrary as another basis for searching their residence was apparently not supported by information within Galluzzi's possession.

It is clear from simply reading the Affidavit that it misstates actual evidence in the TBI File and is riddled with false—or, at the very least, completely unsupported—allegations. Based on the discrepancies between the information in the investigative reports within the TBI File and the statements made in Galluzzi's Affidavit, and "[v]iewing the evidence in the light most favorable to [the plaintiffs]," the court finds that, "while there is no indication that [Galluzzi] acted intentionally or deliberately, a reasonable jury could find that [he] recklessly disregarded information in his possession negating probable cause." *Tlapanco*, 969 F.3d at 650. The plaintiffs, in other words, have plausibly alleged that, "at the time [Galluzzi] swore out the affidavit, [he] knew of or possessed information that contradicted the sworn assertions." *Id.* at 649.

The next question is whether, once the court "set[s] aside the [false] statements and include[s] the information omitted," "the affidavit is still sufficient to establish probable cause.'" *Id.* Here, once the false statements are removed from the Affidavit, the Affidavit essentially contains *no* information specific to 2248 Preserve Circle—and certainly not sufficient information to establish the existence of probable cause for a search of the residence at that address. The Affidavit contains seven paragraphs that are meant to establish probable cause. (Doc. No. 27, at 60 ¶¶ 7–13.) Once all the false statements are removed, the only information left to support the request for a search warrant are the facts that (1) a CI gave information about the leader of a drug trafficking ring; (2) one of the nicknames the leader goes by is "Francisco"; (3) an individual

known as "Luis" was a suspect implicated in the Investigation; (4) upon a query of 2248 Preserve Circle in Antioch, investigators found the resident to be Francisco Carranza; (5) Carranza was known to be a "close relative/associate" of an "individual by the name of 'Luis'"; and (6) a query with Nashville Electric Service found the account owner for service at 2248 Preserve Circle to be Francisco Carranza-Giles and Orquidea Rivera-Peña. (Doc. No. 27, at 60–61 ¶¶ 11–12.) The court takes judicial notice of the fact that "Francisco" and "Luis" are not uncommon Hispanic names. Moreover, neither the TBI File nor the Affidavit contains *any* information suggesting that the leader of the DTO and Carranza are the same person. Nor does it suggest that Carranza's "close relative/associate" named Luis was the same "Luis" implicated in the Investigation. The Affidavit identifies no basis for suspecting drug activity at 2248 Preserve Circle, once the false statements are removed.

To summarize, the right to be free from searches and seizures predicated on a law enforcement officer's reckless submission of false statements in a warrant affidavit was clearly established at the time of the search at issue here, and the plaintiffs have made a sufficient showing, at the pleading stage, that Galluzzi's Affidavit contained recklessly false statements that were material to the finding of probable cause. To be sure, discovery may allow Galluzzi to paint a different picture, but, based on the facts as alleged by the plaintiffs, Galluzzi cannot establish entitlement to qualified immunity as to the Fourth Amendment claim based on the search of the plaintiffs' home.

### C. Second Claim for Relief – Detention During Search of Home

Galluzzi argues that the claim based on the unlawful seizure of Carranza, Peña, and Jennyfer Rivera during the search of their home should be dismissed, because they were "properly detained during the execution of a search warrant." (Doc. No. 31, at 8.) He asserts that, "[s]ince the search was pursuant to a valid warrant, . . . officers had the authority to detain Plaintiffs during

the execution of the warrant." (*Id.*)

If the plaintiffs had attempted to sue the police officers who actually detained them based on their reliance on a facially valid search warrant issued by a neutral magistrate, Galluzzi's argument would hold more water. However, as set forth above, the plaintiffs have adequately alleged that the Search Warrant for 2248 Preserve Circle was invalid and that Galluzzi knew or should have known that it was invalid, insofar as it was based on recklessly false statements in his Affidavit. Galluzzi offers no argument for the validity of the detention in the absence of a valid warrant, except to assert that he was not personally involved in the detention.

### D. Galluzzi's Personal Involvement

Galluzzi contends that the Second and Third Claims for Relief, based on Rivera's arrest and detention without probable cause and the detention of the rest of the family during the search of the home, both fail, because the plaintiffs fail to allege his personal involvement in those events.

To establish liability under 42 U.S.C. § 1983, a plaintiff may not rely on a theory of "respondeat superior" or vicarious liability "to find a party liable based on the actions of subordinates." *Pineda v. Hamilton Cty.*, 977 F.3d 483, 490 (6th Cir. 2020) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–95 (1978)). Instead, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* (quoting *Iqbal*, 556 U.S. at 676). That is, each defendant must be "personally involved" in the unconstitutional action. *Id.* (quoting *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013)).

The plaintiffs here allege that Galluzzi obtained the Search Warrant for 2248 Preserve Circle by including materially false statements in his Affidavit; that he "recklessly failed to perform any due diligence" to verify whether there was a connection between any of the plaintiffs and the DTO he was investigating (FAC ¶ 25); and that no probable cause existed and no search

warrant would have issued but for his actions. In addition, the plaintiffs allege that Galluzzi personally identified the plaintiffs to other law enforcement officers on the DTF and "organized and directed a multi-agency law enforcement operation for the purpose of searching and seizing the Plaintiffs and their property on November 16, 2022." (FAC ¶¶ 33, 34.) They specifically allege that officers pulled over Rivera because Galluzzi had identified her as a participant in criminal activity and "directed them to seize her and/or her vehicle." (FAC ¶ 37.) They allege that he did so, despite having "no knowledge of facts or circumstances which could provide a reasonable basis" for detaining her. (FAC ¶ 38.) They likewise allege that, but for the false statements in his Affidavit, no search warrant would have issued and law enforcement officers would not have had a basis for detaining the other defendants.

It may well be that the plaintiffs' Second and Third Claims for Relief relate simply to additional damages the plaintiffs suffered as a result of the issuance of the Search Warrant. At this juncture, however, for purposes of Galluzzi's Motion to Dismiss, the court finds that the plaintiffs plausibly allege that the seizure and detention of their persons took place at Galluzzi's direction and/or as a direct result of the invalid Search Warrant, obtained by Galluzzi despite his being in possession of no facts or circumstances giving rise to probable cause to suspect any of them of criminal activity.

## IV.    CONCLUSION

For the reasons set forth herein, the defendant's Motion to Dismiss (Doc. No. 30) will be denied. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge